**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DONNA M. HARCULA, | ) | CASE NO. 1:22-CV-01950-CEF |
| Plaintiff, | ) | |
| | ) | U.S. DISTRICT JUDGE |
| v. | ) | CHARLES ESQUE FLEMING |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | U.S. MAGISTRATE JUDGE |
| SECURITY, | ) | JENNIFER DOWDELL ARMSTRONG |
| | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.     INTRODUCTION

Plaintiff Donna M. Harcula ("Ms. Harcula") seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1). U.S. District Judge Charles E. Fleming has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

## II.     PROCEDURAL HISTORY

Ms. Harcula filed DIB and SSI applications on February 25, 2020, alleging a disability onset date of January 1, 2018. (Tr. 227-35).[1] These applications were denied initially and upon reconsideration. (Tr. 142-51, 163-70). Ms. Harcula requested a hearing before an administrative law judge ("ALJ"). (Tr. 171-72). On October 20, 2021, an ALJ held a telephonic hearing due to

---

[1] The administrative transcript ("Tr.") is located at ECF Doc. 5 on CM/ECF.

the COVID-19 pandemic, during which Ms. Harcula, represented by counsel, and a vocational expert ("VE") testified. (Tr. 44-103). On November 2, 2021, the ALJ issued a written decision finding Ms. Harcula not disabled under the Social Security Act. (Tr. 16-33). The ALJ's decision became final on August 29, 2022, when the Appeals Council declined further review. (Tr. 1-6). Ms. Harcula filed a Complaint on October 29, 2022, challenging the Commissioner's final decision. (ECF Doc. 1). She raises the following assignments of error:

(1) The ALJ committed harmful error when he failed to find that Harcula's plantar fasciitis, degenerative disc disease, dizziness, and tinnitus were severe impairments at Step Two of the Sequential Evaluation.

(2) The ALJ erred when he failed to find that the opinions of the treating sources were consistent with and supported by the medical evidence and failed to incorporate the state limitations into his RFC.

(3) The ALJ committed harmful error when he modified the definition of superficial interaction in his RFC.

(4) The ALJ erred at Steps Four and Five of the Sequential Evaluation in that substantial evidence did not support the RFC finding that Harcula could perform work at the medium level of exertion.

(ECF Doc. 7, PageID#800).

### III.  BACKGROUND INFORMATION

#### A.  Personal, Educational, and Vocational Experience

Ms. Harcula was born in 1964. (Tr. 50). She is a high school graduate and received some college education. (Tr. 51). She lives alone, and she has three adult children and nine grandchildren. (*See* Tr. 63). At time of the hearing, she possessed a driver's license and car insurance. (Tr. 51). Her past relevant work was employment as a production assembler, machine operator II, and industrial truck operator. (Tr. 30).

#### B.  Relevant Hearing Testimony

##### 1.  *Ms. Harcula's Testimony*

Ms. Harcula alleged that she has been unable to sustain full-time work activity since the alleged onset date due to a combination of symptoms from her impairments, including depression; anxiety with panic attacks; posttraumatic stress disorder; vertigo; tinnitus; and chronic bronchitis. She testified that she is unable to work because she is always exhausted, has trouble staying awake, feels weak and fatigued, and  has trouble breathing. (Tr. 60-61). She explained that she experiences shortness of breath easily, especially when walking up and down stairs. (Tr. 61). She also testified that she has difficulty focusing and getting along with people, noting that she is quick to anger and easily agitated. (*Id.*).

Ms. Harcula testified that on a typical day she wakes up, prepares coffee, eats, and feeds and plays with her cats. (Tr. 62). She stated that she attempts to do household chores, but she has difficulty focusing on and finishing tasks. (*Id.*). She also testified that she takes five-hour naps during the day and still feels exhausted when she wakes up. (*Id.*). She reported that she is able to vacuum occasionally and do her own laundry, but her daughter helps carry heavier items up the stairs. (Tr. 62-63). She also testified that she does not belong to social groups or attend church; does not participate in any hobbies; and does not babysit her grandchildren. (Tr. 63-64). She reported that she goes to the store, but she can only stay for a short time because she is not able to wear a mask; it "makes [her] cough and [she] can't breathe." (Tr. 62).

Ms. Harcula also reported that her legs hurt "all the time," and that standing for long periods of time is not good for her. (Tr. 61). She testified that her doctors have stated that her leg pain is due to stenosis in her back. (*See* Tr. 61-62). She further testified that she can only stand for "no more than one hour." (Tr. 70). She also testified that she can walk approximately one block without issues, but if she tries to walk to the corner by her home, she has to come home and rest for about

30 minutes. (*Id.*). She reported that she could lift about 10 pounds but is not able to carry that much weight, and she uses a wagon to transport groceries from her car to the steps. (Tr. 70-71).

She also testified that she has difficulty remembering how to do things and difficulty concentrating. (Tr. 68). She explained that she struggles with reading recipes, newspapers, and books due to concentration issues. (*Id.*). She also reported that she does not watch or go to the movies anymore because she cannot sit still long enough, and she falls asleep. (Tr. 69-70).

With respect to her vertigo, Ms. Harcula testified that she "look[s] like [she is] drunk when [she is] walking." (Tr. 71). She testified that she "bounce[s]" into doorjambs and cannot get onto a ladder or a footstool, and that she fears falling down when walking up and down stairs. (*Id.*). She also reported hearing a "ticking" in her head, and that when this "ticking starts," she knows she will not walk well if she stands up too fast. (*See id.*). She testified that "beeping" triggered this "ticking." (*See* Tr. 72). She stated that she experiences a "ticking" episode at least once or twice a week that requires her to seek shelter or rest so that she would not get hurt. (*Id.*). She testified that the "ticking in [her] brain…dizziness" are symptoms of her tinnitus. (Tr. 75). She reported that she also hears "ringing" due to her tinnitus every day. (*Id.*).

Ms. Harcula further elaborated on her breathing issues. Ms. Harcula testified that she experiences wheezing and shortness of breath if she exerts herself too much, and she would then require a breathing treatment. (Tr. 74). She testified that she must take this breathing treatment three to four times a day, and that it makes her feel exhausted and dizzy. (*See id.*). She also keeps her inhaler on her person and uses that a "few times a day" if she is "not able to sit and take a breathing treatment, or [she] just don't want to" take the breathing treatment. (*See id.*).

Regarding her plantar fasciitis, Ms. Harcula testified that the condition is "very painful," and that she must do exercises and use custom insoles for her shoes. (Tr. 77-78). Regarding her

4

mental health, Ms. Harcula testified that she has difficulty dealing with stress due to traumatic experiences associated with her family members. (Tr. 81-82).

## 2. *Vocational Expert's Testimony*

The vocational expert (the "VE") opined that Ms. Harcula's past relevant work was employment as a production assembler, machine operator II, and industrial truck operator. (Tr. 30, 83). As a hypothetical, the ALJ asked the VE whether an individual with Ms. Harcula's age, education, and work experience could perform work at the medium exertional level if the person cannot operate dangerous machinery; cannot engage in commercial driving; can tolerate no more than frequent exposure to dust, odors, fumes, and pulmonary irritants, extreme cold, and extreme heat; can understand, remember, and carry out and complete simple tasks with no fast paced production requirements; can adapt to occasional and superficial interactions with supervisors, coworkers, and the public (meaning no arbitration, mediation, negotiation, confrontation, or being responsible for the safety or supervision of others); and can adapt to only routine workplace changes. (Tr. 84-85). The VE opined that the individual could not perform past relevant work, but could perform work as a janitor, hospital cleaner, and packager. (Tr. 85). The VE stated that his testimony was consistent with the *Dictionary of Occupational Titles* and supplemented his experience and training (*Id.*).

After counsel for Ms. Harcula questioned the VE regarding the cleaner and janitor positions, the ALJ asked the VE to identify additional jobs within the residual functional capacity described in the hypothetical. (Tr. 88). The VE opined that this individual could also perform work as a dishwasher and laundry worker. (*Id.*). After another round of counsel for Mr. Hercula questioning the VE regarding those positions, the ALJ asked the VE to identify other jobs within the residual functional capacity described in the hypothetical. (Tr. 92). The VE opined that this

individual could perform work as a cleaner II. (*Id.*). In his decision, the ALJ noted counsel's cross-examination and dispute over the VE's job findings. (*See* Tr. 31-33). But the ALJ ultimately determined that the VE's testimony on direct examination (not the testimony on cross-examination) was consistent with the *Dictionary of Occupational Titles*, and that the additional jobs the VE opined did not exceed the RFC finding. (*Id.*).

### C.  Relevant Non-Medical/Medical Opinion Evidence

#### 1.  *State Agency Opinions*

##### a.  Medical Consultants

In May 2020, Dr. Lynne Torello, M.D., considered at the initial level of consideration Ms. Harcula's medical record regarding her physical impairments and limitations. (Tr. 110). Dr. Torello opined that Ms. Harcula would be able to perform work at the medium exertional level, except that she should avoid concentrated exposure to extreme cold and extreme heat, and should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (*Id.*). Dr. Steve McKee, M.D., considered Ms. Harcula's record at the reconsideration level and affirmed Dr. Torello's findings in January 2021. (Tr. 127-28).

##### b.  Psychological Consultants

In May 2020, Dr. Irma Johnston, Psy.D., reviewed Ms. Harcula's record regarding her mental impairments and limitations at the initial level of consideration. Dr. Johnston opined that Ms. Harcula had no more than mild limitations in understanding, remembering, or applying information. (Tr. 111). Dr. Johnston further opined that Ms. Harcula had no more than moderate limitations in interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself. (*Id.*). Dr. Johnston also opined that Ms. Harcula can carry out simple tasks in a work environment with no demand for fast pace or strict production quotas, and she can sustain

in a work environment with no more than occasional superficial interaction with others. (*Id.*). Finally, Dr. Johnston opined that Ms. Harcula can sustain in a work environment with no more than routine changes that are explained in advance. (Tr. 112). Dr. Aracelis Rivera, Psy.D., reviewed the medical record at the reconsideration level and agreed with Doctor Johnston's findings in January 2021. (Tr. 128-30).

### 2.  *Dallin Tonks, D.O.*

In July 2020, Dr. Tonks conducted a consultative examination of Ms. Harcula. After examination, Dr. Tonks opined that Ms. Harcula "may be limited from a social standpoint secondary to anxiety[.]" (Tr. 875). Dr. Tonks also opined that Ms. Harcula did not appear at that time to have any limitations with standing, lifting, carrying, sitting, handling, traveling, speaking, memory, or hearing. (Tr. 875). Dr. Tonks did observe, however, that Ms. Harcula appeared to have limitations with "walking [secondary to] dy[sp]nea."[2] (*Id.*).

### 3.  *Ashok Makadia, M.D.*

In July 2021, Dr. Makadia provided an opinion in the form of a recommendation after Ms. Harcula's sleep study. (Tr. 650). Under the section titled "Recommendation" in the treatment records, Dr. Makadia noted that Ms. Harcula should "use extreme caution while driving or working with machinery,"  and should also "achieve and maintain ideal body weight" and "avoid supine sleep." (*Id.*).

### 4.  *Margaret Messerly, M.D.*

In September 2021, Dr. Messerly submitted a checklist form titled "Mental Impairment Questionnaire." (Tr. 722-23). Dr. Messerly noted that Ms. Harcula's first appointment with Dr. Messerly was on October 12, 2016. (Tr. 722). Dr. Messerly diagnosed Ms. Harcula with recurrent

---

[2] Dyspnea is shortness of breath (i.e., a subjective difficulty or distress in breathing) usually associated with disease of the heart or lungs. *Dyspnea*, Stedman's Medical Dictionary 274360 (Nov. 2014).

major depressive disorder and generalized anxiety disorder, and indicated that Ms. Harcula was prescribed Sertraline, Trazodone, and Buspirone. (*Id*.). Dr. Messerly described the clinical findings that supported her assessed limitations as: "obsessive thoughts and high anxiety interfere with concentration, mood[,] and decision making." (*Id.*). Dr. Messerly then explained Ms. Harcula's diagnosis as "crisis intervention 2016." (*Id.*).

In a series of checkboxes, Dr. Messerly assessed Ms. Harcula's limitations, rating the severity of her limitations from unlimited or very good to unable to meet competitive standards. (Tr. 722-23). Regarding Ms. Harcula's sustained concentration and persistence limitations, Dr. Messerly opined that Ms. Harcula was limited but satisfactory in her abilities to perform activities within a schedule, manage regular attendance and be punctual within customary tolerances, and perform at a consistent pace without an unreasonable number and length of rest periods; seriously limited, but not precluded[3] in her abilities to carry out detailed instructions, work in coordination with or in proximity to others without being distracted by them, and complete a normal workday and workweek without interruptions from psychologically based symptoms; and unable to meet competitive standards[4] in her ability to maintain attention and concentration for extended periods. (Tr. 722). With respect to Ms. Harcula's understanding and memory limitations, Dr. Messerly opined that Ms. Harcula was unlimited or very good in her ability to remember locations and work-like procedures, and limited but satisfactory in her ability to understand and remember very short and simple instructions. (Tr. 723).

---

[3] The form defines "seriously limited, but not precluded" to mean that one's ability to function in the specific area is "less than satisfactory, but not precluded in all circumstances. Individual would be limited in their ability to perform activity 15% of [the] time." (Tr. 722).
[4] The form defines "unable to meet competitive standards" to mean that the "patient cannot satisfactorily perform [the] activity independently, appropriately, effectively and on a sustained basis in a regular work setting." (Tr. 722).

Regarding Ms. Harcula's social interaction limitations, Dr. Messerly opined that Ms. Harcula was unlimited or very good in her abilities to interact appropriately with the general public, ask simple questions or request assistance, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; limited but satisfactory in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and seriously limited, but not precluded, in her ability to accept instructions and respond appropriately to criticism from supervisors. (*Id.*). With respect to Ms. Harcula's adaptation limitations, Dr. Messerly opined that Ms. Harcula was unlimited or very good in her abilities to respond appropriately to changes in the work setting, be aware of normal hazards, and take appropriate precautions; and limited but satisfactory in her ability to set realistic goals or make plans independently of others. (*Id.*).

Dr. Messerly also opined that Ms. Harcula's impairments would cause her to be absent from work six days per month. (*Id.*). Dr. Messerly further opined that, on average, symptoms from Ms. Harcula's impairments would cause her to be off task from performing job tasks 10 minutes per hour. (*Id.*).

### D.  Relevant Medical Evidence

#### 1.  *Physical Impairments*

In 2018, testing revealed that Ms. Harcula had normal vestibular battery; no low frequency sensorineural hearing loss; stable hearing; and normal brain MRI. (Tr. 318, 320). At appointments on January 14, 2019, and January 21, 2019, treatment records noted that Ms. Harcula exhibited difficulty with tinnitus, dizziness, imbalance, and falls, and was limited with falling, fear of falling, and ambulation, especially on uneven surfaces or with head turns. (Tr. 313, 315). Later treatment

notes from January 2019 noted that Ms. Harcula's symptoms from tinnitus improved with weekly attendance at physical therapy and compliance with a home exercise program. (*See* Tr. 310, 312).

On April 14, 2019, Ms. Harcula sought emergency treatment for coughing and wheezing, reporting that she had a cough for several days. (Tr. 378). The examination findings noted Ms. Harcula had wheezes and rhonchi,[5] but no rales, and exhibited no tenderness or respiratory distress. (Tr. 380). Treatment notes reflect that Ms. Harcula was a current smoker, and her chest x-rays were clear. (Tr. 381). Ms. Harcula received IV Solu-Medrol breathing treatment with significant improvement. (*Id.*). She was sent home with a Z-pak steroid burst and instructed to follow up with her primary care provider in the next two to three days. (*Id.*).

On July 25, 2019, Ms. Harcula sought emergency treatment with reports of low back pain and sore throat. (Tr. 421). She stated she swam with her grandchildren the previous weekend and then spent a long weekend away with her boyfriend. (*Id.*). She also reported that she had done a lot of gardening, cut down a tree for her mother, and had a tender low back area. (*Id.*). On physical exam, Ms. Harcula exhibited tenderness in the lumbar spine, but her other exam findings were generally unremarkable; she appeared oriented, in no distress, with normal range of motion in her neck, normal range of motion on musculoskeletal exam, normal mood and affect, normal judgment, and all other labs were within normal range. (Tr. 422). Ms. Harcula was given Toradol, IV fluids, and Decadron for treatment in the emergency room, and she appeared to have a viral component pharyngitis, along with a urinary tract infection. (*Id.*). Ms. Harcula was also given Macroibid for treatment of the urinary tract infection, and she was discharged with instructions to follow up with her primary care provider. (*Id.*).

---

[5] Rhonchi are added sounds with a musical pitch occurring during inhalation or exhalation that are heard on auscultation of the chest and caused by air passing through bronchi that are narrowed by inflammation, spasm of smooth muscle, or presence of mucus in the lumen. *See Rhoncus*, Stedman's Medical Dictionary 783490 (Nov. 2014).

In August 2019, Ms. Harcula continued to report throat pain and discomfort without improvement. (Tr. 443-44). Her treatment records noted hoarseness of voice and a small papilloma-like lesion to the posterior pharyngeal wall. (Tr. 444). The treatment records also reported throat discomfort and swallowing problems, but the exact etiology was unclear. (*Id.*). Ms. Harcula received a fiberoptic laryngoscopy, which showed Ms. Harcula's right nasal airway and nasopharynx was normal. (*Id.*). Ms. Harcula's hypopharangeal exam revealed very severe mucosal thickening in the posterior commissure with moderate hyperemia; cobblestoning of the posterior commissure and esophageal entrance; however, no other masses or lesions were noted and both vocal cords were mobile. (*Id.*). A CT of Ms. Harcula's neck showed no abnormal masses or tumors. (*Id.*). Her medical provider noted that there was nothing on her scope exam or CT that "[should not] cause [her] severe levels of pain." (*Id.*). Ms. Harcula's treatment records indicated her throat discomfort was possibly viral in nature; globus sensation was most likely secondary to GERD; and she was improving with Prilosec and antireflux measures. (Tr. 440-41).

On July 25, 2020, Ms. Harcula attended a physical consultative examination with Dr. Tonks. (Tr. 573-87). Ms. Harcula reported having had chronic bronchitis that was made worse after working in a welding factory in 2015, and she continued to have breathing issues after leaving that job. (Tr. 573). She endorsed consistent shortness of breath with no home oxygen use at the time of the exam, and worsening symptoms with minimal exertion; specifically, she explained that walking 50 feet or up one flight of stairs was enough to make her short of breath. (*Id.*). The physical examination findings noted distant breath sounds bilaterally without wheezes, rales, or rhonchi; normal gait; no significant pain with palpation; no limitations in passive range of motion or in strength; negative straight leg raise tests; and that she sat comfortably throughout the exam. (Tr. 574). The ancillary testing showed no restrictive or obstructive disease. (*Id.*). Overall, Dr. Tonks

noted that, based on the exam and reports, Ms. Harcula "appear[ed] to have limitations with walking [secondary to] dy[sp]nea." (Tr. 575).

On October 20, 2020, Ms. Harcula sought treatment for complaints of bilateral arch/heel pain that that had been present for approximately three months. (Tr. 636). She endorsed pain in the morning upon walking and after periods of rest. (*Id.*). Her treatment notes indicated pain was elicited on palpation of the plantar medial calcaneal tubercle in the region of the intrinsic musculature and plantar fascia, but no pain on medial-lateral compression of the calcaneus, and the posterior tibial tendon was intact with 5/5 strength. (*Id.*). Ms. Harcula was diagnosed with plantar fasciitis, and her medical provider discussed the need for custom orthotics. (Tr. 637). On November 11, 2020, Ms. Harcula continued to report bilateral arch/heel pain. (Tr. 638). Her November 2020 exam findings were similar to the exam findings from her October 2020 appointment.

At a follow-up appointment on December 10, 2020, Ms. Harcula received custom orthotics. (Tr. 640). The treatment notes indicated that Ms. Harcula's custom orthotics fit well, and that her in-office gait evaluation and ambulation "reveal[ed] continued improvement of symptomatology and gait." (*Id.*). The treatment notes also stated that Ms. Harcula "w[as] able to ambulate without distress with use of the custom made orthotic devices with shoes." (*Id.*).

Lumbar x-rays from January and February 2021 showed distal lumbar arthritis, possibly distal lumbar stenosis in the lumbar spine. (Tr .741-42). Her January 2021 cervical spine x-ray showed mid-cervical arthritis with minimal motion with flexion and extension. (Tr. 743).

In July 2021, Ms. Harcula underwent on overnight polysomnography to evaluate obstructive sleep apnea syndrome. (Tr. 649). The study findings revealed severe O2 desaturation present with "lowest sat of 78% and O2<89% for 8.0 minutes"; mild snoring; and arousal index of

58.6 per hour, which indicates severe sleep fragmentation. (Tr. 650, 707-08). The study also revealed no significant sleep apnea with an AHI of 4.5/hr present; sleep efficiency was normal with decreased N1, increased N2, decreased N3, and normal REM; sleep latency of 32.1 minutes indicating prolonged sleep onset; and REM latency of 127 minutes, which indicates prolonged REM onset. (Tr. 650). Ms. Harcula was diagnosed with hypoxia based on the sleep study results, and medical providers recommended she use O2 with sleep. (Tr. 713). The treatment notes reflect that Ms. Harcula was diagnosed with unspecified COPD and was still smoking a half a pack of cigarettes per day. (*Id.*). The treatment notes also reported that Ms. Harcula reported shortness of breath with exertion and occasional wheezing. (*Id.*).

Ms. Harcula attended a follow-up pulmonology appointment in September 2021. The treatment notes stated that Ms. Harcula was on "2-3 lit with sleep and sleeping much better." (Tr. 690). She had decreased the number of cigarettes she smoked to a quarter pack per day. (Tr. 691). Her chest x-rays showed no active disease, and pulmonary function testing showed hyperinflation that was likely mild small airway obstruction. (*Id.*). Ms. Harcula's exam findings noted diminished breath sounds bilaterally, but the remainder of her physical exam findings were generally unremarkable. (*See* Tr. 692-93).

## 2. *Mental Impairments*

Ms. Harcula has a documented history of mental impairments, including depressive disorder and anxiety disorder. During the relevant period, she underwent mental health treatment, including medication management and counseling services, with Dr. Messerly.

On January 10, 2019, Ms. Harcula reported that she was dealing with "severe dizziness and tinnitus for [the] past couple of months," and these symptoms were "interfering with daily function and two attempts to return to work." (Tr. 453). She continued to report multiple stressors related

13

to family matters, and she also indicated that she felt stressed and exhausted. (*Id.*). The mental status examination findings revealed that Ms. Harcula was well-groomed, with logical and racing thought processes, clear and rapid speech; had fair memory and good insight/judgment; and depressed and anxious mood with full affect. (Tr. 453-54).

On March 14, 2019, Ms. Harcula reported that she was unable to work due to "ongoing symptoms of vertigo." (Tr. 456). She also reported recent stressors related to her children and her children's history of substance dependence. (*Id.*). The mental status examination findings revealed that Ms. Harcula was well-groomed; alert; distracted; and with preoccupied and obsessional thought content, circumstantial associations, good memory, good insight/judgment, and depressed and anxious mood with full affect. (Tr. 456-57).

On September 24, 2019, Ms. Harcula reported that she was keeping "very busy" and was moving "back home closer to her parents, so she can help them as needed." (Tr. 520). She reported anger, disgust, and sadness over the effects of heroin on her family, including her "daughter's overdose while incarcerated." (*Id.*). On exam, Ms. Harcula presented with racing, circumstantial thoughts and rapid speech. (*Id.*). She was anxious, distracted, and preoccupied. (Tr. 520-21). Her mental status exam findings otherwise were within normal limitations. (Tr. 520-21). Dr. Messerly continued Ms. Harcula's  buspirone and venlafaxine medication and advised her to return to care in three months. (Tr. 521-22).

On December 16, 2019, Ms. Harcula reported increased stress due to her father's health issues, and she presented as anxious and distractible with racing thoughts and rapid speech. (Tr. 523-24). Due to her reports of trouble sleeping, Dr. Messerly prescribed Trazodone. (Tr. 524).

After a break in treatment, Ms. Harcula returned to Dr. Messerly on July 13, 2020, and asked to resume therapy due to increased stress caused by the death of her father three months ago.

14

(Tr. 589-91). She reported that she had moved in with her mother full-time and was her primary caretaker. (*Id.*). On examination, Ms. Harcula presented as anxious with rapid speech and racing, tangential, and obsessional thoughts. (Tr. 589-90). She was also distractible. (Tr. 589-90). Dr. Messerly increased her buspirone dosage. (Tr. 590-91).

On October 27, 2020, Ms. Harcula presented with a similar mental status, but she was not distractible. (Tr. 595-97). Ms. Harcula was advised to seek online support due to her "consistently poor" attendance at therapy. (Tr. 596).

On January 19, 2021, Ms. Harcula reported that she had a "lot going on" because her daughter was due to have a baby soon, her mother was recovering from hernia surgery, and her son had recent legal problems. (Tr. 652). She also reported that her mood was stable, with anxiety related to situational stressors. (*Id.*). On examination, Ms. Harcula presented as alert and anxious with racing and logical thoughts and clear and rapid speech. (Tr. 652-54).

On May 12, 2021, Ms. Harcula reported symptoms of depression including sadness, irritability, poor sleep, obsessive thoughts, and lack of interests and pleasure. (Tr. 659). She was prescribed Zoloft and sertraline. (Tr. 659-61).

On July 1, 2021, Ms. Harcula reported being pleased with the addition of Zoloft. (Tr. 663). She was described as the primary caretaker of her mother. (*Id.*). On examination, Ms. Harcula was anxious and distractible with racing and obsessional thinking (Tr. 665-67).

On August 25, 2021, Ms. Harcula's mental status was normal. (*See* Tr. 681-83).

IV.    THE ALJ'S DECISION

In his November 2021 decision, the ALJ first found that Ms. Harcula met the insured status requirements of the Social Security Act through June 30, 2023. (Tr. 18). The ALJ then found Ms. Harcula has not engaged in substantial gainful activity since January 1, 2018, the alleged disability

onset date. (*Id.*). The ALJ further determined that Ms. Harcula has the following severe impairments: hypoxia, chronic obstructive pulmonary disease ("COPD"),[6] asthma, depressive disorder, and anxiety disorder. (Tr. 19). However, the ALJ found that none of these impairments—individually or in combination—met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 19).

The ALJ also determined that Ms. Harcula could perform work at the medium exertional level except with the following limitations:

> no dangerous machinery, no commercial driving; frequently be exposed to extreme cold and extreme heat; and frequently exposed to dust, odors, fumes, and pulmonary irritants; can understand, remember, carry out, and complete simple tasks with no fast pace production requirements; can adapt to occasional and superficial interactions with supervisors, coworkers, and the public (superficial is defined as no arbitration, mediation, negotiation, confrontation, or being responsible for the safety or supervision of others); and can adapt to routine workplace changes.

(Tr. 22).

The ALJ next determined that Ms. Harcula is unable to perform any past relevant work. (Tr. 30). He also determined that transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a "not disabled" finding regardless of whether Ms. Harcula has transferable job skills. (*Id.*). The ALJ, however, determined that – considering Ms. Harucla's age, education, work experience, and residual functional capacity – there are jobs that exist in significant numbers in the national economy that Ms. Harcula can perform. (Tr. 30-33). Accordingly, the ALJ determined that Ms. Harcula was not disabled as defined in the Social Security Act. (Tr. 33).

## V.  LAW AND ANALYSIS

---

[6] Chronic obstructive pulmonary disease is a general term used to refer to a group of diseases with "permanent or temporary narrowing of small bronchi" that cause airflow blockage and breathing-related problems. *See Chronic Obstructive Pulmonary Disease (COPD)*, Stedman's Medical Dictionary 253710 (Nov. 2014).

A. **Standard of Review**

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

17

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

## B. Standard for Disability

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

## C. Analysis

Ms. Harcula raises four assignments of error: (1) the ALJ erred at Step Two by failing to find that her plantar fasciitis, degenerative disc disease, dizziness, and tinnitus were severe

impairments; (2) the ALJ erred in evaluating the consistency and supportability of the medical opinions; (3) the ALJ improperly "modified" the definition of superficial interaction in the RFC finding; and (4) the ALJ erred in finding that Ms. Harcula  was capable of performing work at the medium exertional level. (*See* ECF Doc. 9, PageID#800). I find that these assignments of error lack merit for the reasons set forth below.

> 1. ***At Step Two, the ALJ Properly Determined that Ms. Harcula's Plantar Fasciitis, Degenerative Disc Disease, Tinnitus, and Vertigo/Dizziness were Non-Severe Impairments.***

Ms. Harcula argues that the ALJ erred at Step Two because he failed to find that her plantar fasciitis, degenerative disc disease, tinnitus, and vertigo/dizziness were severe impairments. (ECF Doc. 8, PageID#808-11). In response, the Commissioner asserts that the ALJ's Step Two finding is supported by substantial evidence. (ECF Doc. 9, PageID#836-37). In the alternative, the Commissioner argues that the ALJ's error was harmless because the ALJ considered all these impairments later in the sequential evaluation. (*Id.* at PageID#838). For the reasons set forth below, I find that Ms. Harcula's arguments lack merit.

### a.  Legal Standard

At Step Two of the sequential evaluation process, an ALJ must determine with a claimant's medically determinable impairment is a "severe" impairment. *See* 20 C.F.R. § 404.1520(a)(4)(ii). A "severe" impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c). "Step two has been described as a 'de minimus hurdle'; that is, 'an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n.2 (6th Cir. 2007) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988)).

### b.  ALJ's Step Two Analysis

The ALJ determined that Ms. Harcula had the following severe impairments: hypoxia, COPD, asthma, depressive disorder, and anxiety disorder. (Tr. 19). The ALJ then determined that Ms. Harcula's plantar fasciitis and degenerative disc disease were not severe impairments. (*Id.*). The ALJ explained:

> In this case, the record fails to substantiate more than mild limitations caused by the claimant's plantar fasciitis or degenerative disc disease. The treatment records show the claimant has been diagnosed with plantar fasciitis, but she also received treatment and noted improvement in her symptoms. Additionally, treatment records noted the claimant presented with normal gait and normal strength in her feet (16F). Further, regarding her degenerative disc disease, x-rays from early 2021 showed multilevel arthritis, possible distal lumbar stenosis in the lumbar spine; and cervical arthritis, minimal motion with flexion and extension of the cervical spine; but do not show ongoing follow up or further treatment of these issues and subsequent physical exam findings are generally unremarkable (19F; 21F/19-21; 22F). Thus, these impairments are deemed non-severe because they have not individually, or in combination with other impairments, caused more than minimal work-related difficulties for a continuous period of at least 12 months (20 CFR 404.1521 et seq. and 20 CFR 416.921 et seq.).

(*Id.*).

### c.  Plantar Fasciitis[7]

Ms. Harcula has not established that the ALJ's decision regarding the severity of her plantar fasciitis lacks substantial support. Here, as demonstrated above, the ALJ determined that Ms. Harcula's plantar fasciitis was not a severe impairment because she received treatment and noted improvement in her symptoms, and the treatment records reflected that Ms. Harcula presented with normal gait and normal strength in her feet. (*Id.*). This conclusion finds support in the record. Indeed, as the ALJ observed later in the decision, Ms. Harcula was diagnosed with plantar fasciitis in October 2020 (Tr. 25; *see* Tr. 637). At her appointment in October and November 2020, her medical provider noted that she had an intact posterior tibial tendon with 5/5 strength. (Tr. 636,

---

[7] Plantar fasciitis is inflammation of the plantar fascia (a band of tissue that connects one's heel bone to the base of one's toes) that elicits foot and heel pain. *See Plantar Fasciitis*, Stedman's Medical Dictionary 322870 (Nov. 2014).

638). In December 2020, after Ms. Harcula was fitted with custom orthotics, a medical provider noted that "[i]n-office gait evaluation and ambulation reveal[ed] continued improvement of symptomatology and gait." (Tr. 640). Specifically, a provider observed at the appointment that Ms. Harcula was able to "ambulate without distress" using her custom orthotics. (*Id.*).[8] Ms. Harcula's argument merely points to the same records cited by the ALJ and requests this Court to reach a different conclusion. (*See* ECF Doc. 7, PageID#809 (cites Tr. 636-37, 640); *see Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) ("If substantial evidence supports the Commissioner's decision, this Court will defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion."). She did not meet her burden in demonstrating her plantar fasciitis was a severe impairment at Step Two. Thus, I find that this argument lacks merit.

### d. Degenerative Disc Disease

Similarly, Ms. Harcula has not established that the ALJ's decision regarding the severity of her degenerative disc disease lacks substantial support. Here, the ALJ determined that Ms. Harcula's degenerative disc disease was not a severe impairment because – despite x-rays showing degenerative disc disease – the record reflects no ongoing follow up or further treatment of the issue, and subsequent physical exam findings were unremarkable. (Tr. 19). Although Ms. Harcula contends that the ALJ merely cited to pulmonary appointment records (ECF Doc. 7, PageID#810), this argument overlooks the fact that these subsequent appointments contained relevant physical examination findings that discussed not only Ms. Harcula's pulmonary system, but also her musculoskeletal system. Those physical examination findings were, as the ALJ accurately pointed

---

[8] Although not stated by the ALJ, Ms. Harcula also does not demonstrate that this impairment caused more than minimal work-related difficulties for a continuous period of at least 12 months. Indeed, the only records Ms. Harcula cites are dated from October 2020 to December 2020. And as stated above, Ms. Harcula demonstrated improvement in her symptomology/gait upon her fitting with custom orthotics. (*See* Tr. 640).

out, relatively unremarkable. For example, in August and September 2021, Ms. Harcula demonstrated a normal range of motion. (Tr. 750, 767).[9] Moreover, Ms. Harcula does not challenge the ALJ's conclusion that the record reflects no ongoing follow up or further treatment of these issues. Indeed, Ms. Harcula points to *no* records suggesting otherwise—and my independent review of the record did not find any such records.  (*See* ECF Doc. 7, PageID#810 (citing Tr. 417, 421, 422, 443)). Here, the ALJ presented substantial evidence in support of his conclusion, and Ms. Harcula's challenge consitutes an impermissible request to reweigh evidence to reach her preferred conclusion. *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). Thus, Ms. Harcula did not meet her burden in demonstrating the ALJ erred regarding the severity of her degenerative disc disease at Step Two of the sequential evaluation.

### e.  Tinnitus and Vertigo/Dizziness

Whether the ALJ erred by not considering Ms. Harcula's tinnitus and dizziness severe impairments at Step Two presents a close call. To be sure, the ALJ did not discuss or designate Ms. Harcula's tinnitus and vertigo as severe impairments in his Step Two analysis. (Tr. 19). But the Sixth Circuit has held, in general, that when an ALJ finds both severe and non-severe impairments at Step Two and continues with subsequent steps in the sequential evaluation process, error at Step Two may not warrant reversal. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the failure to find an impairment severe at Step Two is not reversible error when the ALJ continues through the remaining steps of the evaluation and can consider non-severe impairments when assessing an RFC); *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008); *Hedges v. Comm'r of Soc. Sec.*, 725 F. App'x 394, 395 (6th Cir. 2018). "After an ALJ

---

[9] Ms. Harcula correctly points out that the ALJ pointed to duplicate records from August 2021 and September 2021 pulmonology records, but the ALJ's proposition that the physical examination findings were generally unremarkable was an accurate characterization.

makes a finding of severity as to even one impairment, the ALJ 'must consider the limitations and restrictions imposed by *all* of any individual's impairments, even those that are not 'severe.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (emphasis in original, quoting SSR 96-8p).

Here, the ALJ found that Ms. Harcula suffered from other impairments besides tinnitus and dizziness that satisfied the severity criteria of Step Two. Thus, any error in the ALJ's evaluation of Ms. Harcula's tinnitus or dizziness at Step Two was harmless. *Anthony*, 266 F. App'x at 457. The remaining question to be resolved, therefore, is whether the ALJ failed to properly consider Ms. Harcula's tinnitus and dizziness at Step Four of the sequential evaluation process. The ALJ's decision reflects that the ALJ considered Ms. Harcula's reports of tinnitus and dizziness. The ALJ first noted some of the testimony that Ms. Harcula provided regarding her dizziness. (*See* Tr. 22 ("The claimant alleged that [s]he has been unable to sustain full time work activity since the alleged onset date due to…vertigo [and] tinnitus."); Tr. 23 (noting Ms. Harcula testified that "if she is walking she starts to fall over and bump into things")). The ALJ then noted in the RFC discussion that Ms. Harcula has a history of tinnitus, dizziness, and imbalances, and discussed relevant records dealing with those conditions. (Tr. 24). But the ALJ also highlighted that these symptoms improved with therapy and compliance with a home exercise program. (*Id.*). Further, the state agency physicians considered Ms. Harcula's allegations related to tinnitus and vertigo/dizziness. They determined, despite Ms. Harcula's tinnitus and vertigo/dizziness, that she was able to perform work at the medium exertional level. (Tr. 107, 114, 115, 124, 132). The ALJ found these opinions persuasive and adopted them. (Tr. 27).

Moreover, Ms. Harcula fails to point to objective medical evidence upon which one could conclude that Ms. Harcula's condition had or was likely to last over 12 months. Specifically, the

medical records she cites regarding her tinnitus and dizziness/vertigo span less than 12 months. (*See* ECF Doc. 7, PageID#810 (citing Tr. 321-22 (January 2019), 331-32 (October 2018)). Nor does she identify any other objective medical evidence demonstrating any deficits stemming from her tinnitus and vertigo dated after the prior determination of non-disability in October 2019. (*See id.*). Thus, Ms. Harcula does not demonstrate that the ALJ erred in this regard.

In sum, Ms. Harcula has not established that the ALJ's designation of plantar fasciitis and degenerative disc disease as non-severe, and the ALJ's failure to discuss tinnitus and dizziness/vertigo at Step Two resulted in reversible error. Accordingly, I recommend that the Court reject this assignment of error because it lacks merit.

## 2. *The ALJ Appropriately Evaluated the Medical Opinion Evidence.*[10]

Ms. Harcula raises disparate arguments under a broad assignment of error that asserts that the ALJ improperly evaluated the medical opinion evidence. First, she argues that the ALJ improperly evaluated the opinion of Dr. Tonks because the ALJ's RFC erroneously found that Ms. Harcula could stand/walk at least six hours a day as needed for work at the medium level of exertion. (ECF Doc. 7, PageID#813). Next, she argues that the ALJ erred in evaluating Dr. Makadia's opinion because the ALJ failed to include limitations that took into account Ms. Harcula's complaints of "constant fatigue and sleepiness" in the RFC. (*Id.*). Finally, Ms. Harcula

---

[10] Courts in the Northern District of Ohio have previously cautioned Ms. Harcula's counsel to refrain from combining disparate challenges and arguments regarding the sequential disability evaluation together in a single assignment of error. *See, e.g.*, *Dellarco v. Comm'r of Soc. Sec.*, No. 4:22-CV-00962-PAB, 2023 WL 3324833, at *9 n.6 (N.D. Ohio Apr. 20, 2023), *report and recommendation adopted*, 2023 WL 3320142 (N.D. May 8, 2023); *Nelson v. Comm'r of Soc. Sec.*, No. 1:21-CV-01784-JG, 2023 WL 2435332 (N.D. Ohio Jan. 31, 2023), *report and recommendation adopted*, 2023 WL 2431989; *Overstreet v. Comm'r of Soc. Sec.*, No. 1:21-CV-2062, 2022 WL 15524729, at *11 n.9 (N.D. Ohio Oct. 11, 2022) (citing Case No. 1:21-cv-00556, Doc. 19, at 34 n.7 (filed 3/2/2022); Case No. 5:20-cv-02850, Doc. 19, at 34 n.5 (filed 2/2/2022); Case No. 5:20-cv-01340, Doc. 21, at 26 n.9 (filed 8/16/2021); Case No. 1:20-cv-01186, Doc. 21, at 25 n.8 (filed 8/16/2021)), *report and recommendation adopted*, No. 1:21CV2062, 2022 WL 15522981 (N.D. Ohio Oct. 27, 2022)).

argues that the ALJ improperly evaluated the consistency and supportability of Dr. Messerly's opinion. (*Id.* at PageID#813-17). Each argument will be addressed in turn.

### a. Evaluation of Dr. Tonks' Opinion

Ms. Harcula first argues that the ALJ improperly evaluated Dr. Tonks' opinion. Specifically, Ms. Harcula contends that ALJ erred because he credited Dr. Tonks' opinion that Ms. Harcula "appear[ed] to have limitations with walking [secondary] to dyspnea" but then did not include any specific walking-related limitations in the RFC. (*See* ECF Doc. 7, PageID#813 (citing Tr. 22 (RFC finding) and Tr. 575 (Dr. Tonks' opinion)). But reading the ALJ's decision as a whole and with common sense, this argument lacks merit. Medium work incorporates some limitation in walking that someone limited to performing medium work is only expected to stand or walk, off and on, for approximately six hours in an eight-hour workday and is not required to walk for an entire eight-hour period. 20 C.F.R. §§ 404.1567(c), 416.967(c); Social Security Ruling 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983).

The state agency consultants opined that Dr. Tonks' opinion was consistent with a limitation to performing work at the medium exertional level with some additional environmental limitations. (Tr. 109, 117, 127, 135). Here, in evaluating Ms. Harcula's RFC, the ALJ evaluated and found generally persuasive the opinions of the state agency consultants. State agency opinions may constitute substantial evidence supporting an ALJ's decision. *See* 20 C.F.R. § 404.1513a(b)(1) (The Commissioner's "medical or psychological consultants are [deemed to be] highly qualified and experts in Social Security disability evaluation."); *Brown v. Saul*, No. 5:19-CV-02135, 2020 WL 5569594, at *6 (N.D. Ohio Sept. 17, 2020) (collecting cases). Thus, an RFC determination that is based upon the medical opinions of state agency consultants is generally supported by

substantial evidence. Significantly, Ms. Harcula does not dispute the ALJ's findings regarding the state agency opinions. (*See generally* ECF Doc. 7, PageID#813-17).

Ms. Harcula points to several medical records that she argues would support a different conclusion. (*See* ECF Doc. 7, PageID#813, 815-16). This argument in essence constitutes a request for the court to reweigh the evidence in her favor, which this court cannot do at this stage of review. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469,476 (6th Cir. 2003). Because substantial evidence supports the ALJ's decision, I must affirm the ALJ's decision.

### b. Evaluation of Dr. Makadia's Opinion

Ms. Harcula also argues that the ALJ erred in evaluating Dr. Makadia's opinion. She is not challenging the ALJ's analysis of the consistency and supportability of Dr. Makadia's opinion. Rather, she argues that the ALJ "failed to include any limitations" in the RFC that accounted for the fatigue and sleepiness that underpinned Dr. Tonks' recommendation. (ECF Doc. 7, PageID#813). Also, although not entirely clear, Ms. Harcula appears to contend that the ALJ, in evaluating Dr. Makadia's opinion, credited the entirety of her allegations regarding the intensity, persistence, and limiting effects of her fatigue and sleepiness and so should have included greater limitations in the RFC to account for those symptoms. (*See id.*). For the following reasons, I disagree.

First, Ms. Harcula's argument that the ALJ failed to include any limitations in the RFC that accounted for fatigue and sleepiness appears to be a misreading of the record. Dr. Makadia — but no other medical source (including Dr. Tonks)— opined limitations stemming from Ms. Harcula's issues involving fatigue and sleepiness. Next, the ALJ *did* account for Dr. Makadia's assessed limitations in connection to Ms. Harcula's fatigue and sleepiness. Specifically, the ALJ found Dr. Makadia's opinion that Ms. Harcula use extreme caution while driving or working with machinery

26

to be persuasive (Tr. 27; *see* Tr. 650) and adopted these limitations into the RFC. (Tr. 22 (RFC limitation includes a limitation of "no dangerous machinery" and "no commercial driving")).

Similarly, Ms. Harcula's argument is unpersuasive that the ALJ, in evaluating Dr. Makadia's opinion, credited the entirety of her allegations regarding the intensity, persistence, and limiting effects of her fatigue and sleepiness, and thus the ALJ should have included greater limitations in the RFC to account for those symptoms. This assertion is not a reasonable reading of the ALJ's decision. Reading that decision as a whole, the ALJ explained that Ms. Harcula's allegations were not fully supported by or consistent with the evidence. (Tr. 22-27). The ALJ next determined that Dr. Makadia's opinion would be credited due to the fatigue and sleepiness-related limitations contained within the medical opinion. (Tr. 27-28). In doing so, the ALJ did observe that Ms. Harcula testified that she took five naps per day (Tr. 62) and she was too exhausted to read a recipe, newspaper, or book (Tr. 68).  But the ALJ pointed to other evidence in the record that demonstrated why greater limitations were not warranted in the RFC. (*See generally* Tr. 23-30). Ms. Harcula fails to demonstrate how the ALJ has erred in this regard. Accordingly, I find that this sub-claim lacks merit.

### c.  Evaluation of Dr. Messerly's Opinion

Ms. Harcula argues that the ALJ's persuasiveness analysis of Dr. Messerly's opinion was error because the assessed limitations were supported by and consistent with the medical evidence. (*See* ECF Doc. 7, PageID#813-17). I disagree and find that the ALJ properly evaluated Dr. Messley's opinion, and that the ALJ's findings were supported by substantial evidence.

In the instant case, the ALJ did not find Dr. Messerly's opinion (Tr. 722-23) persuasive because the assessed limitations were not supported by or consistent with the medical evidence, and because Dr. Messerly did not support any of the assessed limitations with an explanation. (Tr.

28-29). The ALJ's conclusion is supported by substantial evidence. Dr. Messerly opined on a checkbox form that Ms. Harcula had a range of limitations. (*See generally* Tr. 722-73). The only explanations that Dr. Messerly provided was a list of Ms. Harcula's diagnoses of recurrent major depressive disorder and generalized anxiety disorder; a list of medications and their corresponding dosages; a description of the clinical findings, stating "obsessive thoughts and high anxiety interfere with concentration, mood [,] and decision making"; and a prognosis stating "crisis intervention 2016." (Tr. 722). As the ALJ concluded, Dr. Messerly offers little, if any, explanation for the majority of the assessed limitations on the checkbox portion of the opinion form; her assessment of how many days per week Ms. Harcula would be absent from work; or for how many breaks she anticipated Ms. Harcula would require. (Tr. 28-29; *see* Tr. 722-23). *See Price v. Comm'r of Soc. Sec.*, 342 F. App'x 172, 176 (6th Cir. 2009) (finding the ALJ did not err in discounting a doctor's opinion where the doctor failed to identify objective medical findings in support when filling out an opinion questionnaire); *Nussbaum v. Comm'r of Soc. Sec.*, No. 5:22-CV-01763, 2023 WL 5353142, at *9 (N.D. Ohio Aug. 1, 2023), *report and recommendation adopted*, 2023 WL 5352398 (N.D. Ohio Aug. 21, 2023).

Further, the ALJ's conclusion that Dr. Messerly's treatment records do not support the high level of limitation opined to on the checkbox form is also supported by substantial evidence. As the ALJ noted, the mental status exam findings generally noted rapid but clear speech; racing and logical thought process; no abnormal thought content; intact associations; anxious mood with full affect; and good memory, insight, and judgment. (Tr. 29; *see* Tr. 526-27, 589-90, 595-96, 652-53). Moreover, the Commissioner also correctly points out that Dr. Messerly's opinion regarding Ms. Harcula's distractibility is not entirely supported by the evidence. Ms. Harcula presented as distractable during three examinations. (Tr. 468, 534, 526, 589). But Dr. Messerly's treatment

28

notes do not reveal that Ms. Harcula was so distractible that she was as limited as assessed. And in assessing Ms. Harcula's ability to concentrate, persist, or maintain pace, the ALJ found that she had only moderate limitations because, despite Ms. Harcula's reports of limitations in concentrating generally, she also reported contradictory activities of driving, preparing meals, managing funds, and handling her own medical care. (Tr. 21).

Ms. Harcula points to several treatment notes to argue that Dr. Messerly's opinions were supported by and consistent with the medical evidence. (*See* ECF Doc. 7, PageID#814-16). But she makes no argument as to how the ALJ's reasons were not supported by substantial evidence.[11] (*See id.*). Significantly, none of these records were cited by Dr. Messerly in her opinion. (*See generally* Tr. 722-23). Ms. Harcula's argument in essence constitutes a request to reweigh the evidence. But reweighing evidence is not permitted at this stage of review. *See Moruzzi v. Comm'r of Soc. Sec.*, 759 F. App'x 396, 406 (6th Cir. 2018) ("We decide only whether there was substantial evidence to support the ALJ's RFC determination. If so, we defer to that decision even in the fact of substantial evidence supporting the opposite conclusion.") (internal citations omitted); *Harrod v. Comm'r of Soc. Sec.*, No. 3:17CV1839, 2018 WL 3869897, at *16 (N.D. Ohio Aug. 15, 2018) ("Although Plaintiff clearly believes the ALJ should have assessed more restrictive limitations based on her interpretation of the medical record, that belief does not establish a violation of the substantial evidence standard."). The ALJ's decision is not subject to reversal "merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citation omitted). Because substantial evidence supports the

---

[11] It is unclear why Ms. Harcula's argument includes multiple records involving tinnitus, lumbar pain, and plantar fasciitis when arguing Dr. Messerly's opinion was supported by and consistent with the whole record. (*See* ECF Doc. 7, PageID#815-16). Her argument fails to tie any of these records to Dr. Messerly's assessed limitations or offer any clear rationale to guide this legal inquiry. (*See id.*). Further, Dr. Messerly's opinion was premised on Ms. Harcula's psychological limitations, *not* her physical/neurological limitations. (*See generally* Tr. 722).

conclusion reached by the ALJ, I must affirm even if Ms. Harcula could point to a preponderance of the evidence which goes the other way. *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020); *Canterbury v. Comm'r of Soc. Sec.*, No. 5:22-cv-1741, 2023 WL 3742297, at *15 (N.D. Ohio Apr. 26, 2023), *report and recommendation adopted*, 2023 WL 3742848 (N.D. Ohio May 31, 2023).  Accordingly, I find no basis for remand based on Ms. Harcula's challenge to the evaluation of Dr. Messerly's opinion.

### 3. The ALJ Properly Accounted for Ms. Harcula's Limitation to Superficial Interaction by Finding that Ms. Harcula had the RFC to Perform Work Requiring No Arbitration, Mediation, Negotiation, Confrontation, or Being Responsible for the Safety or Supervision of Others.

Ms. Harcula argues that the ALJ erred because he modified the definition of "superficial interaction" in his RFC finding. (*See* ECF Doc. 7, PageID#817-18). Specifically, she contends that the RFC provided an "unsupported definition/limitation to [her] ability to perform superficial interactions." (*Id.* at PageID#818). She argues that a court in the Southern District of Ohio has determined that superficial contact goes to the quality of interactions. (*Id.* (citing *Hutton v. Comm'r of Soc. Sec.*, No. 2:20cv339, 2020 WL 3866855, at *4 (S.D. Ohio July 9, 2020)). She further asserts that a court within the Northern District of Ohio explained that superficial interaction would exclude interactions requiring thoroughgoing, in-depth, comprehensive, or detailed interactions. (*Id.* (citing *Metz v. Kijakazi*, No. 1:20-cv-2202, 2022 WL 4465699, at *9 (N.D. Ohio Sept. 26, 2022)). Accordingly, she contends that the ALJ's RFC finding of no arbitration, negotiation, confrontation, being responsible for safety of others, or supervision of others "erroneously expanded the definition of superficial [interaction]." (*Id.*). This argument lacks merit.

Ms. Harcula argues, relying on *Metz*, that the ALJ erred in defining the term "superficial" because a court in this district explained that superficial interaction would exclude interactions

requiring thoroughgoing, in-depth, comprehensive or detailed interactions. (ECF Doc. 7, PageID#718). But Ms. Harcula's assertion creates a standard not articulated by the *Metz* court. In *Metz*, the ALJ found that the claimant could perform a full range of work at all exertional levels, but with the additional nonexertional limitations of being able to perform routine tasks in a low-stress environment involving superficial interpersonal interactions with coworkers (specifically no arbitration, negotiation, or confrontation) and no interaction with the general public as a job requirement. 2022 WL 4465699, at *5. The claimant argued that the ALJ erred by failing to include all of the mental limitations assessed by the state agency consultants, despite finding their prior administrative medical findings to be persuasive. *Id.* at *9. Specifically, the claimant took issue with the ALJ's omission of the term "brief" from the RFC, which limited contact with co-workers and supervisors to superficial. *Id.* The court determined that the claimant suffered no prejudice from this omission. *Id.* In doing so, the court explained that a limitation to superficial interaction "excludes interactions that would require more than brief interaction, as superficial interaction excludes thoroughgoing, in-depth, comprehensive, or detailed interactions." *Id.* The court further stated that the limitation to superficial interaction "reasonably encompasses a prohibition encompasses a prohibition against interactions that go beyond brief interactions." *Id.* Accordingly, the ALJ concluded that the RFC limitation, which also included a limitation of no arbitration, negotiation, or confrontation with coworkers, was not error.

Here, Ms. Harcula's citation to *Metz* does not support her proposition that the ALJ erred. Rather, after the *Metz* court defined superficial interaction as excluding thoroughgoing, in-depth, comprehensive, or detailed interactions, the court affirmed an RFC that defined superficial interaction as involving "no arbitration, negotiation, or confrontation" in articulating this definition of superficial interaction. *See* 2022 WL 4465699, at *9. In the instant case, the state agency

psychologists opined that Ms. Harcula could perform in a work environment with no more than occasional superficial interaction with others. (Tr. 111, 119, 129, 137). Because the term "superficial" has not been defined by the Commissioner, the ALJ defined superficial interaction to mean "no arbitration, mediation, negotiation, confrontation, or being responsible for the safety or supervision of others." (Tr. 22). Ms. Harcula fails to demonstrate how the ALJ improperly expanded the definition of superficial interaction by including a limitation of no arbitration, negotiation, confrontation, or being responsible for the safety or supervision of others. *Cf. Escobar v. Colvin*, 2014 WL 6982312, at *8 (N.D. Ohio Dec. 9, 2013) ("superficial" interaction means no negotiation, arbitration, confrontation, responsibility for the health and safety of others, or supervision of others). And Ms. Harcula does not cite any other legal authority or present a persuasive argument to the contrary. Accordingly, I find that this argument lacks merit.

### 4. *Substantial Evidence Supports the ALJ's RFC Finding That Ms. Harcula Could Perform Work at the Medium Exertional Level.*

Ms. Harcula argues that the ALJ erred at Steps Four and Five because substantial evidence did not support the RFC finding that Ms. Harcula could perform work at the medium exertional level. (*See* ECF Doc. 7, PageID#818-23). Ms. Harcula reiterates her hearing testimony and points to medical records supporting this conclusion. (*Id.* at PageID#820-21). Although unclear, she appears to argue that the testimony and medical record provided evidence supporting her allegations of pain that interfered with her ability to sustain activities. (*See id.* at PageID#821-22). She also argues that the RFC is not supported by substantial evidence because the ALJ failed to find any limitations related to Ms. Harcula's fatigue. (*Id.* at PageID#822). She then argues that the ALJ erred because the ALJ made "contradictory statements" because he credited her reports of constant fatigue and sleepiness during the daytime when assessing Dr. Tonks' medical opinion, but did not credit those complaints in the RFC. (*See id.* at PageID#823).

This assignment of error reiterates several arguments already raised in previous assignments of error. When the ALJ determined that Ms. Harcula was capable of performing work at the medium exertional level, the ALJ evaluated Ms. Harcula's subjective complaints in light of the medical, non-medical, and medical opinion evidence. (Tr. 22-30). In doing so, the ALJ addressed Ms. Harcula's complaints of fatigue. Specifically, the ALJ discussed evidence demonstrating that Ms. Harcula did not present with persistently abnormal medical signs that supported her allegations. For example, Ms. Harcula reported improvement in sleep with use of nighttime oxygen. (Tr. 25; *see* Tr. 690). At her September 2021 pulmonary appointment, the physical exam findings noted that Ms. Harcula exhibited diminished breath sounds bilaterally, but her other findings were "generally unremarkable." (Tr. 25 (citing Tr. 693)).

Similarly, as discussed above, the ALJ discussed Ms. Harcula's plantar fasciitis. (Tr. 25). The ALJ acknowledged that Ms. Harcula experienced bilateral arch/heel pain. (Tr. 25; *see* Tr. 638). However, upon receiving custom molded, fully functional orthotics, her in-office gait evaluation and ambulation revealed continued improvement of symptomatology and gait. (Tr. 25; *see* Tr. 640). The ALJ even discussed her lumbar x-rays (Tr. 19; *see* Tr. 471-72), but her physical examinations from August 2021 and September 2021 appointments were generally unremarkable despite the diagnosis of degenerative disc disease. (Tr. 19; *see* Tr. 750, 767). Further, Ms. Harcula's medical record does not demonstrate she sought ongoing treatment for this issue. Finally, the ALJ found generally persuasive the state agency opinions that assessed that Ms. Harcula retained the ability to perform work at the medium exertional level. (Tr. 27); *Brown*, 2020 WL 5569594, at *6.

Although Ms. Harcula's argument is not entirely clear, I construe Ms. Harcula to contend that if the ALJ erred at Step Four and should have reached an RFC finding more restrictive than

the medium exertional level, this would be a harmful error at Step Five because the Grid mandates a finding for a person of Ms. Harcula's age, education, and work experience at the light exertional level. (*See* ECF Doc. 7, PageID#823). And Ms. Harcula further asserts that her counsel made an argument for light work. (*Id.* (citing Tr. 80)). Because the ALJ's RFC finding is supported by substantial evidence for the reasons articulated throughout this Report and Recommendation, I find that Ms. Harcula's Step Five argument lacks merit.

Here, Ms. Harcula's argument relies on previously cited records and her testimony to establish that the ALJ should have reached a different conclusion. But, even if Ms. Harcula points to substantial evidence that supports her conclusion, the ALJ also highlighted substantial evidence pointing towards a different conclusion. Thus, the ALJ's decision must be affirmed. *See Jones*, 336 F.3d at 477 ("[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ."). Because Ms. Harcula does not demonstrate the ALJ's decision is not supported by substantial evidence or affected by harmful legal error, I find that Ms. Harcula's assignment of error lacks merit.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commisioner's final decision.

Dated: August 31, 2023                                   s/ *Jennifer Dowdell Armstrong*
                                                         Jennifer Dowdell Armstrong
                                                         U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within**

**fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d 505). The failure to assert specific objections may in rare

35

cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).